UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA MARIE BAIN BIRKE, | ) | |
| as personal representative of Mark H. Birke, | ) | |
| and of his Estate on behalf of survivors; as an | ) | |
| Individual, the widow and a survivor of | ) | |
| Mark H. Birke; and as the mother and Next Friend | ) | |
| of M.D.B., a minor, the son and survivor of | ) | |
| Mark H. Birke, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:08 CV 1607 MLM |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT UNITED STATES OF AMERICA'S
MEMORANDUM IN SUPPORT OF *PARTIAL* MOTION TO DISMISS[1]**

COMES NOW Defendant United States of America, by and through its attorneys, Catherine

L. Hanaway, United States Attorney for the Eastern District of Missouri and Nicholas P. Llewellyn,

Assistant United States Attorney for said District, and in support of its *Partial* Motion to Dismiss

for lack of jurisdiction due to a federal employee not acting in the scope of employment and the

discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. §2680(a), states as

follows:

---

[1]   Plaintiffs seek damages under three (3) separate negligence theories. Defendant's Motion to Dismiss encompasses only two (2) of these theories. Defendant is not submitting a dispositive motion at this time regarding Plaintiffs' allegation of "negligent supervision" for failing to use reasonable care when supervising Airman Jakubowski, whose vehicle struck Decedent, in that the airman's supervisor allegedly knew that when he granted Airman Jakubowski permission to operate a vehicle the airman was "overly tired and insufficiently alert and unfit to operate a motor vehicle ." *Complaint, pp. 11-12.*

## SUMMARY OF THE FACTS

### 1.    Scope of Employment

Airman Brett A. Jakubowski ("Amn Jakubowski") was arrested on August 13, 2006, for underage drinking and failure to stop and obey the police.  *Gov't Exh. A, Ground Accident Investigation Report ("GAIR") V-15.8.*  As a result, Amn Jakubowski received an Article 15, non-judicial punishment in the form of losing a stripe and 30 days of extra duties pursuant to AFI 51-202, 3.17.4[2]  *Gov't Exh. B.* Amn Jakubowski's normal duties were dealing with patients in the Eglin Air Force Base ("AFB") Hospital on a daily basis, as he was the head technician for Dr. Miller, a vascular surgeon.  *Gov't Exh. C, GAIR V-1.4.*   His normal duty hours consisted of 9 hour days from 7:00 a.m. to 4:00 p.m. Monday through Friday. *Id. at GAIR V-1.6.* Amn Jakubowski's Article 15 extra duties were to be performed in the hospital's emergency department for thirty (30) consecutive days without a day off.  He would work an additional three (3) hours in the emergency department during the week from 4:00 p.m. to 7:00 p.m. and twelve (12) hours both Saturday and Sunday from 7:00 a.m. to 7:00 p.m.  *Id. at GAIR, V-1.3.*  Amn Jakubowski's Article 15 punishment began on October 11, 2006.  *Gov't Exh. A, GAIR, V-15.4.*  The accident occurred on October 19, 2006 at approximately 9:30 a.m.  *Gov't Exh. D, GAIR, B-3.*  Therefore, at the time of the accident, Amn Jakubowski was approximately two and a half (2 ½) hours into his ninth consecutive twelve hour

---

[2]  Air Force Instruction 51-202 NONJUDICIAL PUNISHMENT

Description:  This instruction implements AFPD 51-2, Administration of Military Justice, and Article 15, Uniform Code of Military Justice (UCMJ), and it supplements the Manual for Courts-Martial (MCM), United States, Part V. It establishes requirements for imposing nonjudicial punishment (NJP) on members of the Air Force and provides rules and procedures for imposing this punishment regardless of the member's assignment.

day.

Airman Uyen Thach ("Amn Thach") was Amn Jakubowski's girlfriend at the time of the accident, and she also worked at the hospital. *Gov't Exh. E, GAIR, V-8.14.* She owned a vehicle and would drive Amn Jakubowski to and from the hospital from time to time, or Amn Jakubowski received rides with his roommate. *Id. at GAIR, V-8.14-8.15.* Amn Jakubowski did not own a personal vehicle. On the evening before the accident, October 18, 2006, Amn Thach picked up Amn Jakubowski from work and told him that she couldn't drive him to work the next morning so he needed to get a ride with his roommate. *Id. at GAIR, V-8.3.* She explained to him that she had volunteered to take one of the commanders to Tyndall AFB for the NCO Academy graduation during the next evening. *Id.* Because the volunteer assignment was between 4:30 p.m. and midnight, Amn Thach's supervisor advised her that she didn't have to come to work early, but that she could come in whenever she woke up. *Id.* Amn Thach further advised Amn Jakubowski that she did not have to be at the hospital until 10:00 a.m., which was the time she had a personal medical appointment for her annual pap smear. *Id. at GAIR, V-8.17.* Amn Jakubowski asked Amn Thach if he could borrow her car to go to work and then pick her up for her appointment, since his roommate went to work at 6:00 a.m. and he did not report until 7:00 a.m. Amn Thach agreed. *Id. at GAIR, V-8.3.* Amn Jakubowski spent the night before the accident at Amn Thach's room and awoke at approximately 4:30 a.m. The last time Amn Thach saw Amn Jakubowski was at 4:30 a.m. when he took her car keys and walked out of her room. *Id.*

On October 19, 2006, Amn Jakubowski arrived at work approximately five (5) minutes early. *Gov't Exh. C, GAIR, V-1.8.* When he arrived at work that morning and saw his supervisor, Staff Sergeant Larrilyn Darif ("Sgt. Darif"), Amn Jakubowski approached Sgt Darif and indicated he did

not have a car and that he had borrowed his girlfriend's car because she volunteered for extra duty that day. *Id. at GAIR, V-1.12;V-1.15.* Because Amn Jakubowski had Amn Thach's car, he requested permission from Sgt Darif to run the personal errand of picking up his girlfriend around 9-9:30 a.m. to bring her back to the hospital, and also get his cell phone that he left in Amn Thach's room. *Id. at GAIR, V-1.8;V-1.15.* Sgt. Darif was not sure about what time Amn Thach wanted to be at the hospital. Sgt Darif only knew that Amn Jakubowski requested to leave by 9:30 a.m. *Id. at GAIR,V-1.9.* At that time, Sgt Darif, knowing that Amn Thach lived in the dorms, said that it would be okay to go get Amn Thach, bring her to the hospital to make sure she got her car and he got his cell phone. *Id. at GAIR,V-1.15.* There is no evidence that Amn Jakubowski ever mentioned to Sgt Darif that he needed to return Amn Thach's vehicle so that she could go to her 10:00 a.m. medical appointment. At approximately 9:20-9:25 a.m., Amn Jakubowski approached Sgt Darif about leaving the hospital and asked if it was alright to run his errand. *Id.* Sgt Darif told Amn Jakubowski that it was all right to leave since the schedule looked okay. *Id.* That was the last time Sgt Darif spoke to Amn Jakubowski. *Id.*

On his way to Amn Thach's dormitory to give her back her car and to retrieve his cell phone, Amn Jakubowski was traveling eastbound on Eglin Blvd, parallel to Eglin AFB NW-SE Runway.[3] Along the south side of Eglin Blvd. was a tour group of approximately 89 members, *Gov't Exh. F,GAIR,V-9.8,* some taking photographs of aircraft flight operations. *Gov't Exh. G, pp. 3-5.* The name of the group was the F-4 Phantom II Society ("Society").[4]

---

[3]  Eglin Blvd. is a four-lane limited access highway that runs through Eglin Air Force Base.  The speed limit is 45 mph.  *Gov't Exh. G, pp. 1-2.*

[4]  http://www.f4phantom.com/---F-4 Phantom II Society is a non-profit, California-based organization dedicated to the preservation of the history of the McDonnell Douglas F-4 Aircraft. The F-4 Phantom II Society, Inc., is an international organization open to all persons or groups interested in the

While driving eastbound in the vicinity of the tour group, Amn Jakubowski unexplainably swerved off of the right side of the road and hit two Society members; the first Society member hit suffered a broken leg, and the other, Mark Birke ("Decedent"), suffered a severed leg and other injuries at the scene and died the following day at Baptist Hospital in Pensacola, Florida. The Ground Accident Investigation Report indicated that Amn Jakubowski was traveling at an excessive rate of speed between 62-64 m.p.h. at the time Decedent was struck by the vehicle. *Gov't Exh. H, GAIR, J-14.* After striking both tour members, Amn Jakubowski swerved back onto the road and drove directly across into the oncoming traffic, where he hit a westbound fuel truck head-on and died at the scene. *Gov't Exh G, p.6.*

## 2.    Discretionary Function

In the instant case, Air Force policy drove the activities and decisions surrounding the Society's tour of the base. Air Force Instruction  35-101, *Public Affairs Policies and Procedures* ("AFI 35-101"). *Gov't Exh. I.* The policies and objectives of the Community Relations program were certainly in play.  The commanders who supported making a tour of Eglin AFB available to the Society were driven by goals such as increasing the awareness of day-to-day activities and capabilities of the Air Force as an instrument of national policy, and showing off the unique capabilities of air power.  No doubt the commanders also aimed to create mutual appreciation and cooperation between the Air Force and the Society members as a part of the vast community (domestic and foreign) at large.  The Society was focused on the F-4, a fighter that was taken out

---

study and preservation of the McDonnell Douglas F-4 Phantom II.

of service in the mid 1990's. The tour provided a chance for commanders to show the Society what had replaced the F-4s. Providing the tour also presented the chance to maintain the Air Force's reputation as a respected professional organization partially responsible for national security. A fair reading of AFI 35-101 is Air Force community relations favored inclusion rather than exclusion of the public. The main considerations weighing against permitting the Society's access via Base tour were national security concerns of Operations Security ("OPSEC") due not only to attempting to allow foreign nationals on the Base, *Gov't Exh. J, GAIR V-5.7,* but also, interference with the Operation Readiness Evaluation ("ORE") that was ongoing the day of the tour. *Id. at GAIR V-5.7; V-5.8.* The initial location was going to be on the approach end of runway 1-2 but it was turned downed by "higher powers" than Major Craig Marion ("Maj Marion"), the Society's point of contact for this tour, because of the ORE. *Id. at GAIR, V-5.9; V-5.3.; See also, Gov't Exh K, Aerial Map of possible Eglin AFB tour locations).* The second potential site was by taxiway 1-9, which had to be changed because no government buses were available due to the ongoing exercises and commercial buses were not allowed there. *Gov't Exh. J, GAIR, V-5.9.* The third potential choice of location was by a perimeter road, but was not used due to considerations given to the age of the members of the tour group and that it was a wide open area with no shade on a warm day. *Id.* The final destination selected was Eglin Blvd. but Maj Marion misunderstood about whether to be on the north side of Eglin Blvd. or the south side where the accident occurred. *Id. at GAIR, V-5.10; Gov't Exh. K, (sites 4 and 5).* It wasn't until two days before the tour that Maj Marion determined it was going to be on the south side. *Gov't Exh. J, GAIR, V-5.10.* The north side of Eglin Blvd. was rejected because there were no clear boundaries that indicated the restricted areas and no barriers to keep people off of the airfield and the operations airfield manager indicated it would pose a risk operationally. *Gov't Exh.*

*L, GAIR, V-7.*12.  Chapter 17, ¶ 17.5.3, *Gov't Exh. I,* broadly requires the consideration of safety and national security concerns, but it leaves the judgment up to tour planners/operators as to what is "within the bounds of safety."  Safety was one of the considerations in choosing the tour location. There was no place for the buses to park on the north side of the road and there were concrete cylinders.  Parking across Eglin and having the Society members cross the road was not an option. *See Gov't Exh. L, GAIR, V-7.37*  It was safer to have them park and stand on the south side of Eglin Blvd.  *Id.*  In addition, the choice was made based on the shade and the fact that a picnic table was there, and there was obviously a lot more room to sit at the chosen location.  *Id. at GAIR V-7.39.* Maj Marion and Capt Park also considered the high temperatures and the age of the Society members in choosing the final location.  There was a good week to two weeks of discussion on the best place to place the Society.  *Id. at GAIR, V-7.11.* Capt Park met with Security Forces Squadron the day before the tour to confirm the entry access list and pointed out the location on a map to determine if the Security Forces Squadron had any concerns.  *Id. at GAIR, V-7.11.* It was determined by the Security Forces Squadron that the area was all right since it was a park area with benches. *Id.*

On the morning the tour arrived at the location where the accident occurred, Maj Marion gave a security and safety briefing once the members were off of the buses .  *Gov't Exh. J, GAIR, V-5.13.* He discussed the itinerary, the airfield layout, what they could and could not take pictures of, and described the area where they were located and the safety concerns.  *Id.*  Regarding the safety of the location, Maj Marion  pointed out physical reference points to avoid encroachment on the road.  *Id.*  Maj Marion expressed his concerns to the members of being careful and when taking pictures to avoid walking forward into the road.  In addition, he advised the members that it was a

busy road. *Id.* Capt Park was present and heard Maj Marion's briefing. *Gov't Exh. L,GAIR, V-7.6.* After the briefing, Capt Park asked Maj Marion to physically go and check to verify that everything was in place for the next location where the tour group was going, the King Hanger. *Gov't Exh. J,GAIR, V-5.14.* Capt Park remained with the tour group and Maj Marion left the site, checked the next location, and returned to the site shortly after the accident before the road was shut down. *Id.*

## ARGUMENT

### I.     Motion to Dismiss Standard

"Because jurisdiction is a threshold issue for the court, the district court has 'broader power to decide its own right to hear the case than it has when the merits of the case are reached.'" Bellecourt v. United States, 994 F.2d 427, 430 (8th Cir. 1993)(quoting Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990)). This Court has discretion to satisfy itself as to whether it has jurisdiction to hear the case, as "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." Osborn, 918 F.2d at 730. "No case can properly go to trial if the court is not satisfied that it has jurisdiction... The jurisdiction issue must be resolved first." Id. (quoting Crawford v. United States, 796 F.2d 924,928 (7th Cir. 1986)).  In addition, the plaintiff carries the burden of proof that jurisdiction exists. Osborn, at 730.

Therefore, Plaintiffs' claims against Defendant United States regarding scope of employment and the alleged negligence of directing a tour bus group to an unprotected area next to a roadway must be dismissed in their entirety for lack of subject matter jurisdiction.

### II.     Amn Jakubowski Was Not Acting Within the Scope Of His Employment At The Time of The Accident.

Lawsuits against the United States of America are barred by the doctrine of sovereign

immunity, except to the extent that the United States explicitly waives its sovereign immunity and consents to be sued.  See, e.g., Hercules, Inc. v. United States, 516 U.S. 417 (1996); United States v. Testan, 424 U.S. 392, 400 (1976).  It is axiomatic that the United States cannot be sued unless it specifically consents to be sued.  See United States v. Sherwood, 312 U.S. 584 (1941).  It is also clear that the express terms of any such specific consent by the United States to be sued define and limit the jurisdiction of a federal court to entertain such suit.  United States v. Testan, 424 U.S. at 400.

The exclusive waiver of sovereign immunity for actions sounding in tort against the United States and against its employees acting within the scope of their employment is the Federal Tort Claims Act (hereinafter "FTCA"), which is codified at 28 U.S.C.  § 2671 et seq.  See, C.R.S. by D.B.S. v. United States, 11 F.3d. 791, 795 (8th Cir. 1993) (citing 28 U.S.C. § 2674); 28 U.S.C. § 2679.  As such, the express terms of the FTCA define and limit the jurisdiction of a federal court to entertain tort actions against the United States and against agencies or employees, and the jurisdiction of a federal court is restricted to the terms enunciated in the FTCA.

The specific waiver of sovereign immunity that is contained within the FTCA for actions sounding in tort against the United States, it agencies, and its employees acting within the scope of their employment provides that:

> The district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages. . .  for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

Based upon an extensive investigation of the circumstances leading up to and including this accident, the Office of the United States Attorney General has refused to find and certify that Amn Jakubowski was acting within the scope of his employment.  If the Attorney General refuses "to certify scope of office or employment...., the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment."  28 U.S.C. §2679(d)(3). Tragically, Airman Jakubowski cannot petition this Court to find and certify he was acting within the scope of his office or employment due to his death at the scene. Furthermore, to this date, no surviving heir of Airman Jakubowski has petitioned any court regarding this determination.  In this case, it is the Plaintiffs, the surviving spouse and minor child of Decedent Mark Birke, who are seeking a finding by this  Court that Airman Jakubowski was acting within the scope of his employment when the accident occurred.

A threshold requirement to establish jurisdiction under the FTCA is that the federal employee must have been acting within the scope of his employment when the tort was committed. See Primeaux v. United States, 181 F.3d 876, 878 (8th Cir.1999) ("In determining the extent of the government's FTCA liability, 'scope of employment' sets the line.") (quoting Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 423 (1995)). Scope of employment questions are governed by the law of the state where the alleged tortious acts took place, see St. John v. United States, 240 F.3d 671, 676 (8th Cir.2001) (citing Brown v. Armstrong, 949 F.2d 1007, 1012 n. 7 (8th Cir.1991)), which is Florida in this case. "However, FTCA claims are strictly limited to a scope of employment analysis, regardless of state law doctrines of respondeat superior and apparent authority." Id. (citing Primeaux, 181 F.3d at 878).

-10-

"The general rule in Florida is that an employee who deviates from his employment to engage in a personal errand is not within the scope of his employment if an accident occurs before he returns to the course he was pursuing in the interest of his employer." Drinnenberg v. State, Dep't of Transportation, 481 So.2d 51, 52 (Fla. 2d DCA 1985).

The issue in this case is whether Airman Jakubowski was within the scope of his employment under Florida law at the time of the accident. Defendant submits that Amn Jakubowski was not acting in the scope of his employment with the United States Air Force. "The conduct of a servant is within the 'scope of his employment' only if [1] it is the kind he is employed to perform, [2] it occurs substantially within authorized time and space limits and [3] it is activated at least in part by a purpose to serve the master." Whetzel v. Metropolitan Life Insurance Co., 266 S.2d 89, 91 (Fla. 4th DCA 1972); see also, Sussman v. Florida East Coast Properties, Inc., 557 So. 2d 74, 75 (Fla. 3rd DCA 1990). Although workmen's compensation cases are instructive, Florida courts have repeatedly held that workmen's compensation law subjects employers to a broader scope of liability than the doctrine of respondeat superior. Sussman, at 75, (citing Winn Dixie Stores, Inc., v. Akin, 533 So. 2d 829, 831-32 (Fla. 4th DCA 1988) (Anstead, J., concurring specially, for the proposition that respondeat superior requires a narrower interpretation than workmen's compensation because the policy goal of workmen's compensation is prompt and limited benefits without regard to fault).

Plaintiffs fail to establish scope of employment under the first prong. When Amn Jakubowski left his assigned duties to run his purely personal errand of returning his girlfriend's personal property to her so she could get to her personal medical appointment, as well as retrieve his personal property he that he had left in her room the night before, the Air Force exerted no further control over his actions whatsoever until he returned.

-11-

The second prong is open for interpretation.  Under the first part of the second prong, Amn Jakubowski was on duty at the time he left to run his personal errand and clearly within the time limits of his employment.  However, the second part of the second prong, space limits, is somewhat subjective.  At the time of the accident, Amn Jakubowski did not leave the confines of the Air Force Base but he did leave the hospital. He then traveled on Eglin Blvd. presumably to the dormitories where his girlfriend roomed, a distance of approximately 3-3 ½ miles, which can be seen as both a minor distance and a major distance.

Plaintiffs fail to establish scope of employment under the third prong as there is no evidence to support that this personal errand was, to some degree, activated by a purpose to serve the master. While the evidence shows that Amn Thach needed her personal vehicle to further the business of the Air Force, e.g. volunteered to drive the Commander to the Tyndall AFB for the NCO Academy graduation that evening, there is no evidence that Amn Jakubowski's trip to the dormitory was activated by anything other than serving his girlfriend's needs and retrieving his own personal property.  Sgt. Darif was not sure about what time Amn Thach wanted to be at the hospital.  Sgt Darif only knew that Amn Jakubowski requested to leave by 9:30 a.m. *Gov't Exh. C,GAIR,V-1.9.* At that time, Sgt Darif, knowing that Amn Thach lived in the dorms, said that it would be okay to go get Amn Thach, bring her to the hospital and make sure she got her car and he got his cell phone. *Id. at GAIR,V-1.15.*

At the time of the accident, Amn Jakubowski was no longer under the instruction or control of his employer.  His actions were not taken to serve his employer nor was he engaged in the type of work for which he was employed.  Therefore, at the time of the accident, Amn Jakubowski was not acting in the scope of his employment and Plaintiffs claims against Defendant United States

surrounding Amn Jakubowski's tortious conduct must be dismissed in their entirety for lack of

subject matter jurisdiction.

**III.     Plaintiffs' Claim Regarding the Location Selection  of the Tour Group and Air Force Personnel Assigned to the Group is Barred by the Discretionary Function Exception**

Plaintiffs allege the United States was negligent by:

 "....selecting a location immediately adjacent to a busy highway, Eglin Boulevard, as the site from which the members of the F-4 Phantom II society were to view aircraft flight operations taking place on the Eglin Air Force Base runways across Eglin Boulevard, and directing and escorting the members of the F-4 Phantom II Society to that location....without barriers or curbs to protect the group or crowd from a motor vehicle which might run off the roadway, and without sufficient personnel to control the group or crowd which was focused on viewing the aircraft flight operations across Eglin Boulevard..." *Complaint, p. 8.*

Although the waiver of sovereign immunity within the FTCA is relatively broad, it is not

without limitation.  The FTCA sets forth several very specific statutory exceptions to the waiver of

sovereign immunity for actions sounding in tort that are contained within the FTCA.  The relevant

exception to the FTCA's waiver of sovereign immunity is set forth at 28 U.S.C. § 2680(a).  Pursuant

to that provision, the FTCA's waiver of sovereign immunity does not apply where the challenged

governmental action involves "the exercise or performance or failure to exercise or perform a

discretionary function or duty on the part of a federal agency or an employee of the government."

If a case falls within the statutory "discretionary function" exception to the FTCA, the court lacks

subject matter jurisdiction.  Feyers v. U.S., 749 F.2d 1222, 1225 (6th Cir. 1984), cert. denied, 471

U.S. 1125 (1985); Dalehite v. U.S., 346 U.S. 15, 31 (1953).

Congress has specifically excepted from the limited waiver of sovereign immunity under the

FTCA and precludes tort liability for "[a]ny claims "based upon the exercise or performance or the

failure to exercise or perform a discretionary function or duty on the part of a federal agency or an

employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. §2680(a).  The discretionary function exception to the FTCA serves to "insulate [ ] the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." Berkovitz v. United States, 486 U.S. 531, 537 (1988) The discretionary function exception marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals. United States v. S.A. Empresa de Viaco Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984).  It reflects Congress's "wish[ ] to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Varig Airlines, at 814.  In other words, "if judicial review would encroach upon th[e] type of balancing done by an agency, then the [discretionary function] exception applies." Begay v. United States, 768 F.2d 1059, 1064 (9th Cir.1985).

In order to determine whether the discretionary function exception applies, the United States Supreme Court has set forth a two-part test: (1) the conduct must be discretionary, involving " 'an element of judgment or choice;'" and (2) the judgment must be "'of the kind that the discretionary function exception was designed to shield.'" C.R.S. by D.B.S. at 795-796 (8th Cir. 1993) (quoting Berkovitz v. United States, 486 U.S. at 536 (1988)); See also, United States v. Gaubert, 499 U.S. 315, 322 (1991) (It is the nature of the conduct rather than the status of the actor that governs whether the exception applies).  However, where the duty was mandatory and the government agency or employee violated such duty, the discretionary function exception does not apply because there was no choice involved.  Appley Bros.  v. United States, 164 F.3d 1164, 1170 (8th Cir. 1999)(citation omitted).  Judgment or choice is absent "when a federal statute, regulation, or policy

specifically prescribes a course of action for an employee to follow" because then "the employee has no rightful option but to adhere to the directive."  Berkovitz, 486 U.S. at 536.

When a defendant has brought a factual challenge to subject matter jurisdiction, the burden rests with the plaintiff to prove that jurisdiction does exist.  OSI v. United States, 285 F.3d 947, 951(11th Cir. 2002) (citing Thompson v. Gaskill, 315 U.S. 442, 446 (1942)("Accordingly, if a plaintiff's allegations of jurisdictional facts are challenged by the defendant, the plaintiff bears the burden of supporting the allegations by competent proof.")  Once it has been determined that the discretionary function exception applies, the fact a decision was negligently made is irrelevant and will not bring the challenged conduct outside the exception. Ayer v. United States, 902 F.2d 1038, 1041 (1st cir. 1990) ( citation omitted);  See also, Dickerson, Inc. v. United States, 875 F.2d 1577, 1581 (11th Cir. 1989) (noting that the exception applies even to those actions constituting an abuse of discretion) ("Negligence is simply irrelevant to the discretionary function inquiry."); Reeves v. United States Dept. of Treasury, 809 F.Supp. 92, 94 (N.D. Ga. 1992).

Only if a "federal statute, regulation, or policy specifically prescribes a course of action," Berkowitz v. United States, 486 U.S. 531, 536 (1988), embodying a "*fixed or readily ascertainable standard,*" will a government employee's conduct not fall within the discretionary function exception. Alabama Elec. Co. Co-op v. United States, 769 F.2d 1523, 1529 (11th Cir. 1985) (quoting Miller v. United States, 710 F.2d 656, 663 (10th Cir. 1983), *cert. denied*, 464 U.S. 939 (1983) (emphasis in Miller) (other citations omitted); see also, Syndes v. U.S., 523 F.3d 1179, 1184 (10th Cir. 2008) (rejecting plaintiff's argument that state common law mandated action by the United States); Kennewick Irrig. Dist. v. United States, 880 F.2d 1018 (9th Cir. 1989); Boyle v. United Technologies Corp., 487 U.S. 500 (1988) (discretionary function exception displaces state tort law);

Aretz v. United States, 604 F.2d 417 (5th Cir. 1979); Cisco v. United States, 768 F.2d 788 (7th Cir.

1985); Myslakowski v. United States, 806 F.2d 94 (6th Cir. 1986) – all holding that negligent

performance of a discretionary function does not subject the United States to liability under the

FTCA.

The precise language of the regulation must be considered to determine whether there is

discretion.  Fortney v. United States, 714 F.Supp. 207 (W.D. Va. 1989) (use of the word "should"

indicates a discretion, as opposed to the use of the word "must").   However, the entire regulation

also must be viewed as a whole to determine whether there is discretion or not.  See, Fanoele v.

United States, 975 F.Supp. 1394 (D. Kan. 1997) (Plaintiff cannot pick and choose provisions in

isolation to argue the regulations created a mandatory security plan, but the regulation must be

viewed as a whole); but, see, Matthews v. United States, 720 F.Supp. 1535 (D. Kan. 1989) (use of

the word "will" indicates a mandatory requirement that takes actions in its violations outside the

discretionary function exception).

> **A.** **The Location Selection and Assigned Air Force Personnel  that the Air Force Decided Upon to Allow the F-4 Phantom II Society to View and Photograph Military Aircraft Flight Operations Is A Matter of Judgment and/or Choice.**

In the instant case the regulation that governs the planning and conduct of a base tour is Air

Force Instruction 35-101, *Public Affairs Policies and Procedures* (AFI 35-101). *Gov't Exh. I*

Although compliance with the regulation is mandatory, *Id. at ¶ 1.3*, a review of the regulation

reveals no specific requirements with regard to choice of touring locations.  All Air Force tours are

conducted under the same basic guidelines. *Id. at ¶ 8.34.1.*  General tour guidance includes, "Group

*should* be comprised of no more than 40 participants, or no less than 25, including escorts." *Id. at*

*¶ 8.35.5* (Emphasis added.)  None of the other general guidelines under paragraph 8.35 pertain to

base tours or safety concerns.  Section 8I, ¶ 8.40 of AFI 35-101  pertains specifically to base tours

and open houses.  AFI 35-101 also includes a base tour checklist, which includes the following

headings: Briefers and speakers; Itinerary and Agenda; Arrival; Lodging and Food; Transportation; Media; Follow-up; and Miscellaneous.  There is no mention of choice of touring sites or required number of escorts in correlation with number of tourists, and safety is not addressed anywhere. Chapter 17, ¶ 17.5.3 does state, however, "Part of what makes an Air Force Tour a memorable experience are the photographic memories captured by participants.  Air Force Tour participants *will be allowed* to take personal pictures/video *within the bounds of safety and security*." (Emphasis added.)  There are only two instances in AFI 35-101 where oversight by Air Force members for safety is more clearly prescribed.  *See ¶ 8.34.2* (restricting civilians from operating "any item of military equipment when such operation could cause, or reasonably be perceived as causing an increased safety risk.  This policy is effective regardless of how closely military personnel supervise the civilian visitors." *See also, ¶ 17.5.3* ("Distinguished Visitors (DVs) will observe all safety regulations and follow the directions of the flight crews at all times.")  Thus, with the exception of ¶¶ 8.34.2 and 17.5.3, safety precautions are left to the judgment of tour planners and escorts.

Because no mandatory federal statute, regulation, or policy applicable to the Air Force limits the discretion that the Air Force's own regulations afford it regarding Air Force tours, the first prong of the discretionary function exception test is met.

**B.     The Discretionary Function Exception is Meant to Shield Exactly the Type of Choice the Air Force Made.**

AFI 35-101 outlines the Air Force's policy to foster and maintain good community relations with the public and Base tours are highlighted as an integral part of implementing that policy. According to AFI 35-101 ¶ 1.12.1.1, "Air Force policy is all Public Affairs programs will be designed for the purpose of increasing the awareness and understanding of all Americans concerning: "the day-to-day activities of the Air Force and its capabilities as an instrument of national policy" *¶ 1.12.1.1.3* and "the essential and unique capabilities of air and space power and the Air Force's role in providing for America's national defense" *¶ 1.12.1.1.6*, among other items.

One of Public Affairs' main activities is Community Relations, which encompasses "Creat(ing) mutual acceptance, respect, appreciation and cooperation between the Air Force and the community" and "Maintain(ing) two-way communication between Air Force people and the communities they live in". The objectives of the community relations program are three-fold: (1) "Increase public awareness and understanding of the armed forces and the mission, policies, and programs of the Air Force" *¶ 8.2.1*; (2) "Support Air Force recruiting by inspiring patriotism and encouraging young men and women to serve in the military" *¶ 8.2.2*; (3) "Maintain a reputation as a good neighbor, as well as a respected professional organization charged with part of the responsibility for national security." *¶ 8.2.3*.

There are no specific safety procedures and no restrictions on tour locations, other than for OPSEC purposes and preventing any interference with the mission.

In summary, the facts of the instant case meet the two-part test for discretionary function. AFI 35-101 did not require the planning and operation of base tours to be nearly as structured as other Community Relations activities and it did not require any coordination with major commands. AFI 35-101 outlines multiple public policy considerations for Community Relations and it leaves choice of locations and safety concerns for base tours to the judgment of local Public Affairs officers. When the negligent acts of the government are found to be within the discretion of the government, any suit arising from those acts would be outside the subject matter jurisdiction of the court.

The myriad of administrative decisions of this sort made daily by Air Force officials are exactly the type of decisions the discretionary function exception was created to shield from review under the Federal Tort Claims Act.

## CONCLUSION

For the foregoing reasons, Plaintiffs claims surrounding Amn Jakubowski's scope of employment and the location selection for the tour group and Air Force personnel assigned to the tour must be dismissed for lack of subject matter jurisdiction. Amn Jakubowski was not in the scope of his employment at the time of the accident and the Air Force's decision regarding the location of the tour and the personnel assigned to it was a discretionary function within the meaning of the FTCA.  The United States is entitled to sovereign immunity on these claims.

Respectfully submitted,

CATHERINE L. HANAWAY
United States Attorney

  s/ Nicholas P. Llewellyn
NICHOLAS P. LLEWELLYN   #52836
Assistant United States Attorney
Chief, Civil Division
Thomas F. Eagleton U.S. Courthouse
111 South Tenth Street,   20th Floor
St. Louis, MO 63102
(314)539-7637
(314)539-2777 Fax
Email: nicholas.llewellyn@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on this 10th day of April, 2009, a copy of the foregoing *Memorandum in Support of Motion to Dismiss* was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system, and by hand-delivery, upon the following, to:

Frank J. Kaveney
133 S. 11th Street, Suite 350
St. Louis, MO 63102
frankjkaveney@yahoo.com

  /s/ Nicholas P. Llewellyn
NICHOLAS P. LLEWELLYN